AMERICAN PAPER INSTITUTE, National Forest Products Association, James River Paper Company, Georgia-Pacific Corporation, the Mead Corporation, Westvaco Corporation, Weyerhaeuser Company, St. Regis Paper Company, Union Camp Corporation, Boise Cascade Corporation, Petitioners,

and

The Corn Refiners Association, Inc., Miller Brewing Company, the Great Western Sugar Company, Intervenors,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle, Administrator, Respondents.

AMERICAN FROZEN FOOD INSTITUTE, Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle, Administrator, Respondents.

NATIONAL FOOD PROCESSORS ASSOCIATION, Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.

TANNERS' COUNCIL OF AMERICA, INCORPORATED, Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle, Administrator, Respondents.

FROZEN POTATO PRODUCTS INSTITUTE, Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle, Administrator, Respondents.

AMERICAN TEXTILE MANUFACTURERS INSTITUTE, INC., Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle, Administrator, Respondents.

CHAMPION INTERNATIONAL CORPORATION, Potlatch Corporation, The Proctor & Gamble Paper Products Company, Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle, Administrator, Respondents.

CHEMICAL MANUFACTURERS ASSOCIATION, American Cyanamid Company, Arizona Chemical Company, J. T. Baker Chemical Company, E. I. du Pont de Nemours & Company, FMC Corporation, Glyco Chemicals, Inc., The Goodyear Tire & Rubber Company, Mallinckrodt, Inc., Northern Petrochemical Company, Olin Corporation, Stauffer Chemical Company, Union Carbide Corporation, Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.

Nos. 79–1511, 79–1512, 79–1535, 79–1542, 79–1550, 79–1612, 79–1613, 79–1694, 79–1738, 79–1782, 79–1787 and 79–1804.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 7, 1980.

Decided July 28, 1981.

Henry L. Diamond, Washington, D. C. (John N. Hanson, Jonathan Z. Cannon, Beveridge, Fairbanks & Diamond, Washington, D. C., Richard L. Williams, James L. Sanderlin, Robert E. Payne, David E. Evans, Thomas W. McCandlish, McGuire, Woods and Battle, Richmond, Va.; Russell S. Frye, Smith & Schnacke, Dayton, Ohio, William M. Bradner, Jr., New York City, Michael K. Glenn, Chadbourne, Parke, Whiteside & Wolff, Charles F. Lettow, Janet L. Weller, Cleary, Gottlieb, Steen & Hamilton, Norton F. Tennille, Jr., Thomas H. Milch, Robert S. Angyal, Arnold & Porter, Washington, D. C., Lewis T. Smoak, Eric C. Schweitzer, Ogletree, Deakins, Smoak, Stewart & Edwards, Greenville, S. C., Richard E. Schwartz, Thomas L. Anderson, Collier, Shannon, Rill, Edwards & Scott, H. Edward Dunkelberger, Steven S. Rosenthal, Theodore L. Garrett, Covington & Burling, Washington, D. C., on brief), for petitioners and intervenors.

Ronald C. Hausmann, Pollution Control Section, U. S. Dept. of Justice, Washington,

D. C. (Michelle B. Corash, Gen. Counsel, Barry Malter, E. P. A., James W. Moorman, Asst. Atty. Gen., Angus MacBeth, Deputy Asst. Atty. Gen., Donald W. Stever, Jr., Chief, Pollution Control Section, Jeffrey M. Gaba, E. P. A., Washington, D. C., on brief), for respondents.

Before WIDENER, PHILLIPS and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

The petitioners in these consolidated cases seek judicial review of the actions of the Administrator of the Environmental Protection Agency (EPA) in issuing regulations pursuant to section 304(b)(4)(B) of the Clean Water Act ("the Act")[1] promulgating effluent water limitations controlling conventional pollutants[2] from private industrial sources in accordance with section 301(b)(2)(E) of the Act.[3] This court is vested with the responsibility and authority for making a pre-enforcement examination of the EPA guidelines by section 509(b)(1)(E) of the Act.[4]

Although the petitioners challenge the best conventional technology (BCT) regulations issued pursuant to section 304(b)(4)(B), their primary objection is to the methodology used by the Administrator in promulgating the regulations. In particular, the petitioners contend that Congress in section 304(b)(4)(B) mandated that EPA incorporate two main factors in its methodology for determining BCT: an industry cost-effectiveness test and a test that compares the cost for private industry to reduce its effluent levels with that incurred by publicly owned treatment works (POTWs) for a similar purpose. The petitioners assert that EPA considered only the latter factor and that EPA's benchmark for this latter factor was arbitrary and capricious. Some of the other challenges that the petitioners raise are that EPA used statistically unreliable and internally inconsistent data, and that it deprived petitioners of their right to comment.[5] We hold that all the regulations promulgated pursuant to section 301(b)(2)(E) must be invalidated on the ground that EPA did not consider all the factors mandated by section 304(b)(4)(B).[6] The only other contention that has merit is that the data on which EPA relied in formulating its POTW benchmark are statistically unreliable.

---

1. Section 304(b)(4)(B), 33 U.S.C. § 1314(b)(4)(B), authorizes the Administrator to promulgate regulations that set forth the best conventional pollutant control technology (BCT) for the various industries.

2. Conventional pollutants are defined in the Act to include but not to be limited to, those "classified as biological oxygen demanding, suspended solids, fecal coliform, and pH." 33 U.S.C. § 1314(a)(4). The Administrator is required to "publish and revise as appropriate information identifying conventional pollutants." Id.

3. 33 U.S.C. § 1311(b)(2)(E). This provision of the Act provides in relevant part:
   In order to carry out the objectives of this chapter there shall be achieved ... not later than July 1, 1984, effluent limitations for categories and classes of point sources, other than publicly owned treatment works, which in the case of pollutants identified pursuant to section 1314(a)(4) of this title shall require application of the best conventional pollutant control technology as determined in accordance with regulations issued by the Administrator pursuant to section 1314(b)(4) of this title.

4. 33 U.S.C. § 1369(b)(1)(E). This section provides in relevant part that
   [r]eview of the Administrator's action ... (E) in approving or promulgating any effluent limitation or other limitation under section 1311 ... of this title ... may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person.

5. The petitioners make a specific challenge to the final regulations that were issued using the new methodology for the corn wet milling industry. After the parties filed their briefs, EPA suspended the BCT effluent limitations for this industry subcategory. 45 Fed.Reg. 45,582 (1980). Thus, we find no need to address the petitioners' challenge on this issue.

## I. BACKGROUND

In 1972, Congress amended the Federal Water Pollution Control Act[7] to establish a timetable for achieving certain water pollution control objectives. Congress declared as its policy that the discharge of pollutants in our nation's navigable waters "be eliminated by 1985." 33 U.S.C. § 1251(a)(1). With respect to private industrial sources, such as these petitioners, this achievement was to be accomplished in two stages: an interim level of control effective in 1977, and a final level effective in 1983. The 1977 standard was designated "best practicable technology" (BPT) and the more stringent 1983 standard was "best available technology" (BAT).

Five years later Congress undertook to re-examine these standards. Ultimately, the Federal Water Pollution Control Act was amended again, and the Act as amended became known as the Clean Water Act.[8] Under the Clean Water Act, the 1977 requirements (BPT) were left intact, but changes were made in the 1983 requirements (BAT). As part of these changes, Congress established various standards and schedules for three classifications of pollutants: (1) conventional pollutants; (2) toxic substances; and (3) non-conventional non-toxic pollutants not otherwise classified. 33 U.S.C. § 1311. The strict BAT standards were retained for toxic pollutants known to be dangerous and for non-conventional non-toxic pollutants, the effects of which are uncertain, but the effective date for both categories was delayed.

While the parties disagree over precisely what Congress intended to do when it en-acted the 1977 amendments to the Act and draw markedly different conclusions from the language of the amendments and the legislative history, it is clear that Congress felt that the results produced by the BPT had provided a high degree of water quality improvement, and that in some instances, BAT for conventional pollutants about which much was known might require treatment not deemed necessary to meet the 1983 water quality goals of the Act.[9] Concern was expressed about requiring "treatment for treatment's sake,"[10] and there was much discussion about comparing the cost of treatment with the benefits obtained from the reductions achieved.

Out of this came the development of a new standard, best conventional pollutant control technology (BCT). The new requirement was described by one Senate-House conferee as "the equivalent of best practical technology or something a little bit better, even as far as best available technology in some circumstances."[11]

In directing EPA to promulgate regulations concerning BCT standards, Congress passed section 304(b)(4)(B) of the Act, which provides in part:

> Factors relating to the assessment of best conventional pollutant control technology (including measures and practices) shall include consideration of the reasonableness of the relationship between the costs of attaining a reduction in effluents and the effluent reduction benefits derived, and the comparison of the cost and level of reduction of such pollutants from the discharge from publicly owned treatment works to the cost and level of reduction

---

**6.** These regulations include: 40 C.F.R. §§ 405.-27, .37, .47, .57, .67, .77, .87, .97, .107, .117, .127; 406.27, .37, .47, .57, .67, .77, .87, .97, .107; 407.17, .27, .37, .47, .57; 409.17, .27, .37; 411.-17, .27, .37; 412.17; 418.67, .77; 422.47, .57, .67; 424.17, .27, .37, .47, .57, .67, .77; 426.-17, .27, .37, .47, .57, .67, .77, .87, .107, .117, .127, .137; 427.97; 432.17, .27, .37, .47, .57, .67, .77, .87, .97, .107.

**7.** Act of Mar. 1, 1972, Pub.L. 92–240, 86 Stat. 47.

**8.** 33 U.S.C. § 1251 *et seq.*

**9.** *See* S.Rep.No.370, 95th Cong., 1st Sess. 43 (1977), U.S.Code Cong. & Admin.News 1977, p. 4326. The House bill contained no provision for the modification of the best available technology requirement.

**10.** *Id.* at 44.

**11.** 123 Cong.Rec. H12,944 (daily ed. Dec. 15, 1977) (remarks of Rep. Johnson).

of such pollutants from a class or category of industrial sources, and shall take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environment impact (including energy requirements), and such other factors as the Administrator deems appropriate. 33 U.S.C. § 1314(b)(4)(B).

In addition, in section 73 of the 1977 amendments, Congress directed EPA to "review every effluent guideline promulgated prior to the enactment of this Act which is final or interim final."[12] This required review of all outstanding BAT limitations for

---

12. 91 Stat. 1609.

At the time this action was filed, EPA had evaluated all the BAT regulations for the thirteen secondary industry categories having final or interim final BAT effluent guidelines. These thirteen categories include: dairy, grain mills, canned and preserved fruits and vegetables, canned and preserved seafoods, sugar processing, cement, feedlots, ferroalloys, glass, asbestos, meat products, fertilizer manufacturing, and phosphates industries. Although not all the subcategories of the thirteen categories were analyzed completely for reasons not relevant to our review, EPA did study 93 subcategories of the secondary industries extensively, using the methodology to which the petitioners object. Secondary industries were defined by the Administrator to include those industries not covered in the settlement agreement reached in *National Resources Defense Council, Inc. v. Train*, 8 E.R.C. 2120 (D.D.C.1976). EPA made it clear in its final rules in which it used the contested methodology that it intended to use the same methodology when it reviewed conventional pollutant requirements for the primary industries, i. e., those included in the above mentioned 1976 Consent Agreement. 44 Fed.Reg. 50,732 (1979).

Many of the petitioners and intervenors before us now do not fall within the subcategories for which regulations have been promulgated using the challenged methodology. In fact, of the thirty-five petitioners and intervenors, only three appear to have been subject directly to effluent limitations promulgated using the methodology at the time this action was filed. Of the remaining petitioners and intervenors, many had had effluent limitations using the new methodology proposed for their industry subcategories, but such regulations were withdrawn for possible later reissuance. Others are affected to the extent that regulations have been proposed but not finalized for their industry subcategories, and some of the challenging industries are primary industries for which EPA has expressed an intent to use the methodology under review in establishing effluent limitations.

Because the petitioners primarily object to the methodology EPA has adopted, the question arises as to whether this action is ripe for judicial review. Neither EPA nor industry directly addressed this ripeness issue in its brief; thus, we are compelled to make an independent inquiry into our jurisdiction. *See, e. g. Blanchette v. Connecticut General Insurance Corporations*, 419 U.S. 102, 138, 95 S.Ct. 335, 355, 42 L.Ed.2d 320 (1974); *Schnur & Cohan, Inc. v. McDonald*, 328 F.2d 103 (4th Cir. 1964).

In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court suggested that the lower federal courts take a functional approach in resolving a ripeness issue. The Court articulated the rationale underlying the ripeness doctrine to be:

to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Id.* at 148, 87 S.Ct. at 1515.

The Supreme Court in *Abbott Laboratories* set forth a two-pronged test for judging ripeness. The two factors to be considered are the fitness of the issue for judicial review and the impact on the parties if review is withheld. *Id.* at 149, 87 S.Ct. at 1515.

We think this case is fit for our judicial review because the issue involved is purely legal: whether the Administrator properly construed section 304(b)(4)(B) of the Act when he developed a methodology for assessing the reasonableness of the then existing BAT limitations. Furthermore, the methodology used in promulgating and reviewing effluent limitations is final agency action in that it was adopted by EPA and published in the Federal Register after announcement in the Federal Register and after EPA received and responded to comments submitted by interested parties. *See* 387 U.S. at 149, 87 S.Ct. at 1515. Finally, we think the impact on at least the secondary industries petitioning this court is sufficiently direct and harmful to warrant our intervention at this point. Not only was the methodology developed to review effluent limitations affecting categories of industries to which the petitioners and the intervenors are a part, but EPA in fact has used the methodology to set final BCT standards for many of the secondary industries, with which the petitioners either must spend substantial sums of money to comply or risk

conventional pollutants for all secondary industrial sources within 90 days after the effective date of the amendments.

Pursuant to this Congressional directive, EPA proceeded to carry out its duties. On August 23, 1978, proposed rules were published relating to 13 secondary industry categories. These rules also contained a methodology for determining the reasonableness of any proposed effluent limitation under the BCT criteria. Critical comments were received, and on April 2, 1979, a notice was published indicating that the use of two additional documents was being considered for the data contained therein and that such data might be used in the future for computing the costs and levels of pollutants from POTWs.[13] EPA published its final

---

criminal penalties if they fail to meet the standards. 33 U.S.C. § 1311.

13. The petitioning industries have objected to EPA's use of cost figures from these two documents on the grounds that they were given inadequate notice of how EPA intended to use the documents and that they were not given sufficient time within which to comment. Section 4 of the Administrative Procedure Act requires an agency to make public "either the terms or substance of the proposed rule or a description of the subjects and issues involved" prior to the final promulgation of the rule. 5 U.S.C. § 553(b)(3). While the methodology involved in this proceeding was not designated specifically as a "rule" or "regulation," we find that it falls within the definition of a rule as set forth in the Administrative Procedure Act to the extent that it is an agency statement with a prospective effect designed to implement section 304(b)(4)(B) of the Clean Water Act. *See* 5 U.S.C. § 551(4).

We reject the industries' contention that they were given inadequate notice of EPA's intent to use the two documents. Section 4 does not require an agency to give notice of "every precise proposal which it may ultimately adopt as a rule." *Spartan Radio-Casting Co. v. F.C.C.*, 619 F.2d 314, 321 (4th Cir. 1980), quoting *California Citizens Band Association v. United States*, 375 F.2d 43, 48 (9th Cir.), *cert. denied*, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). An agency may make even substantial changes in its original proposed rule without a further comment period if the changes are in character with the original proposal and are a logical outgrowth of the notice and comments already given. *Basf Wyandotte Corp. v. Costle*, 598 F.2d 637 (1st Cir. 1979).

In our case, EPA has set forth in the Federal Register the methodology it intended to use in determining BCT. In its proposed rules, EPA gave notice of its intent to use a POTW cost comparison and of the documents from which it had obtained its cost estimates. 43 Fed.Reg. 37,591–95 (1978). A sixty-day comment period was initially allowed, and EPA later extended the comment period for another forty-five days and also allowed interested persons to make further comments at a public hearing held on November 27, 1978. EPA notified the public that "[c]omments received at the meeting will be considered in the development of the final methodology and rules." 43 Fed.Reg. 50,226

(1978). It is clear from the record that many comments were received objecting to the documents from which EPA had derived its POTW cost data in its original proposal. ·*See, e. g.*, Comments of Corn Refiners Association, Inc. to EPA (Dec. 1978), App. at 528–31; Comments of American Paper Institute, Inc. to EPA, App. E (Dec. 7, 1978), App. 637–43; Comments by Frozen Potato Products Institute to EPA (Dec. 7, 1979), App. at 1065; Comments of Great Western Sugar Co. to EPA (Dec. 7, 1978), App. at 1113–15.

In response to the criticism levelled at its data base, EPA took a logical step to replace the offending documents. It published a notice in the Federal Register on April 2, 1979 advising interested persons that it was considering using two additional documents to compute the costs and levels of pollutants from POTWs. The use of such documents was suggested in the comments that EPA received. EPA specifically identified the two documents (Dames & Moore, "Construction Costs for Municipal Wastewater Treatment Plants: 1973–1977," (EPA 430/9–77–013, MCD–37, Jan. 1978) and "Analysis of Operations and Maintenance Costs for Municipal Wastewater Treatment Systems," (EPA 430/9–77–015, MCD–39, May 1978)) and indicated that the data derived from them differed from the data previously used in that they showed some diseconomies of scale in operating and maintaining larger POTWs. Copies of the documents were made available for public inspection at EPA's main library in Washington, D. C. and at all of its regional libraries and through the mail upon request. 44 Fed.Reg. 19,214 (1979). It also appears that copies of the two documents had been widely circulated to industrial groups even prior to the April 2, 1979 notice in the Federal Register. Certainly, the documents were adequately identified and made available to the public. Nothing in section 4 of the Administrative Procedure Act requires EPA to give notice of its intent to rely on the two documents. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 52–53 n.117 (D.C. Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

It cannot be said that thirty days was insufficient time for interested parties to voice their concerns. This is not a case in which the final methodology was comprised of uncommented upon data. The data was in fact subject to comment by several parties, *see, e. g.*, Com-

BCT determinations on August 29, 1979, and the petitioners filed these petitions on May 9, 1980, thus presenting these final regulations for our review.

## II. ANALYSIS

### A. COST EFFECTIVENESS TEST

EPA's position is that Congress did not require it to utilize an industry cost-effectiveness test, but instead only mandated a POTW cost comparison standard in arriving at BCT regulations for industry. In interpreting section 304(b)(4)(B), EPA concludes that the proposed effluent guidelines are not required to pass two reasonableness tests. In support of its position, EPA reads the seemingly dual requirements of section 304(b)(4)(B) as one, commanding only a consideration of reasonableness. It contends that the second clause in the relevant portion of section 304(b)(4)(B) sets forth the benchmark of reasonableness—a compari-

son of the proposed BCT cost and level of effluent reduction for industry to the cost and level of reduction from the discharge of POTWs.[14]

■ We are unable to accept this suggested statutory interpretation. When faced with such a question, our starting point for discerning congressional intent is the words of the statute itself. *See American Textile Manufacturers Institute, Inc. v. Donovan,* —— U.S. ——, ——, 101 S.Ct. 2478, 2489, 69 L.Ed.2d 185 (1981); *State Water Control Board v. Train,* 559 F.2d 921, 924–25 n.20 (4th Cir. 1977). The law which empowers EPA to act directs that EPA's effluent regulations "shall . . . specify factors to be taken into account in determining the best conventional pollutant control technology measures and practices to comply with section 1311(b)(2)(E) of this title to be applicable to any point source (other than publicly owned treatment works) within

ments of Great Western Sugar Company to EPA (May 2, 1979), App. at 1211; Comments of American Paper Institute to EPA (May 2, 1979), App. at 1216. The comments appear to have been quite specific raising such issues as the "validity of the underlying data base, inconsistencies in presentation of data in two documents relied on by the Agency, the statistical techniques employed, and the validity of the results." 44 Fed.Reg. 50,762 (1979). In light of the availability of the documents and the extensiveness of the comments, we cannot conclude that the petitioners were denied adequate notice.

14. EPA has cited us to various comments in the legislative history that it claims supports its position. In particular, EPA relies on the statements of Senator Muskie in presenting the Conference Report to the Senate. Muskie commented:

> We are satisfied that he [the Administrator] has the capacity to relate cost of effluent reduction to the effluent reduction benefits, and we have provided him with some guidance. The bill provides as a basis comparison of the costs for industry to the costs for municipalities. Clearly, if the cost of achieving a certain level of reduction of conventional pollutants for industry is less than the cost of achieving a similar level of reduction for a community, it would be reasonable. 123 Cong.Rec. S19,637 (daily ed. Dec. 15, 1977).

EPA also points to the comments of Representative Roberts who, in explaining BCT, noted:

> Comparison of the costs and level of reduction of such pollutants from the discharge of publicly owned treatment works to the cost

and level of reduction of such pollutants from a class or category of industrial point sources is appropriate in making these determinations of reasonableness. 123 Cong.Rec. H12,928 (daily ed. Dec. 15, 1977).

Although these comments mention only the industry POTW comparison for determining reasonableness, it is not reasonable to conclude that their failure to point specifically to an industry cost-effectiveness test is indicative of Congress' intent to exclude such test when it is specifically provided for in the statute. Furthermore, Representative Roberts seems to make reference to an industry cost-effectiveness test in his statement preceding the one to which EPA directs our attention:

> In assessing the need for BCT, the Administrator is required to consider the reasonableness of the relationship between the costs of attaining a reduction in effluents and the effluent reduction benefits derived. Essentially, we are talking about removing additional "cheap pounds" of conventional pollutants. Stated another way, BCT imposes a level of control technology which anticipates and accepts the possibility of an increase in stringency beyond BPT, but not resulting in increased costs beyond the "knee of the curve," the take-off point where incremental costs begin to exceed incremental benefits. *Id.*

As evidenced by the above passages, the legislative history is conflicting and ambiguous at best.

such categories or classes." 33 U.S.C. § 1314(b)(4)(B). Congress did not leave EPA free to select these factors. The statute continues:

> Factors relating to the assessment of best conventional pollutant control technology . . . *shall* include consideration of the reasonableness of the relationship between the costs of attaining a reduction in effluents and the effluent reduction benefits derived, *and* the comparison of the cost and level of reduction of such pollutants from the discharge from publicly owned treatment works to the cost and level of reduction of such pollutants from a class or category of industrial sources. *Id.* (emphasis added)

We find the language of this statute to be clear and straightforward. We thus find no reason to resort to additional rules of statutory construction or to rely on the legislative history, which has minimum probative value because of the numerous conflicts contained therein.

■ EPA's construction of section 304(b)(4)(B) is contrary to the plain meaning of the words contained therein. EPA ignores the mandatory language of the law ("shall"), disregards the conjunctive ("and"), and completely eliminates the first factor. By its own admission, the agency made no effort to determine what it would cost an affected industry to remove a pound of pollutant past the BPT level nor did it compare the cost of such removal with the benefits derived from the removal,[15] as specifically required by statute. *See American Textile Manufacturers Institute, Inc. v. Donovan,* —— U.S. ——, —— & n.30, 101 S.Ct. 2478, 2489 & n.30, 69 L.Ed.2d 185 (1981).

This court has made it clear that EPA must be held to a standard of at least literal compliance with the language of a statute which it is authorized to implement. *Appalachian Power Co. v. Train,* 545 F.2d 1351, 1357 (4th Cir. 1976). Where, as here, the language of the Act is unambiguous and EPA has failed to comply with its di-

rectives, we must grant the petitions to set aside the regulations involved and remand the regulations to EPA for reconsideration. On remand EPA is to develop an industry cost-effectiveness test in accordance with the provisions of section 304(b)(4)(B), employ that test in a manner consistent with the statute, and re-examine all existing BCT regulations to ensure that they are not inconsistent with the proper employment of this industry cost-effectiveness test.

### B. *POTW COMPARISON TEST*

The petitioners also challenge the action of EPA in the formation and application of the POTW comparison test. They argue that EPA erred in using an incremental approach, i. e., one going beyond the cost of normal secondary treatment for POTWs, in arriving at a POTW benchmark. They also contend that even if EPA were permitted to use an incremental POTW comparison, it acted arbitrarily and capriciously because the increment was too large to comply with congressional intent. The petitioners also object to the POTW cost data as being inadequate and statistically unreliable. We reject each of these challenges, except the one directed to the errors in the cost data.

■ For rule making procedures conducted pursuant to Section 4 of the Administrative Procedure Act, 5 U.S.C. § 553, as these were, we must strike "agency action, findings, and conclusions" that we find to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In discussing the scope of judicial review under similar circumstances, this court has emphasized that "[t]he ultimate standard of review is narrow. This court is not empowered to substitute its judgment for that of the agency." *Consolidation Coal Co. v. Costle,* 604 F.2d 239, 243 (4th Cir. 1979), *rev'd on other grounds sub nom., EPA v. National Crushed Stone Association,* 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980). Our court has also stressed that "[i]n evaluating the course of conduct employed by the EPA, we must, of course, bear in mind that Congress

---

**15.** *See* 44 Fed.Reg. 50,733 (1979); 43 Fed.Reg. 37,571 (1978). We find that EPA is required by law to make such an industry cost-benefit com-

parison, and we do not think that it is contained within the industry-POTW comparison that EPA utilized.

vested that agency with the power to choose among alternative strategies." *Appalachian Power Co. v. Train*, 545 F.2d 1351, 1356 (4th Cir. 1976). Under the arbitrary and capricious standard of review, agency action is presumed to be valid, and we must uphold the agency's decision if it is rationally based. *Ethyl Corp. v. EPA*, 541 F.2d 1 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

### 1.

The petitioners specifically argue that EPA erred in concluding that it was appropriate to consider the cost of upgrading POTWs beyond secondary treatment.[16] The petitioners object to the POTW benchmark for several reasons because: (1) secondary treatment is the only specifically defined treatment level that POTWs are required by law to meet;[17] (2) advanced secondary treatment (AST),[18] the increment which EPA chose, was not in existence when Congress enacted section 304 of the Act; and (3) the legislative history indicates that the POTW benchmark should be based on the average cost of normal secondary treatment.

■ We reject the petitioners' contentions. Section 304(b)(4)(B) explicitly authorizes EPA in establishing BCT limitations to compare "the cost and level of reduction of such pollutants from the discharge from publicly owned treatment works to the cost and level of reduction of such pollutants from a class or category of industrial sources." This controlling statute unequivocally directs EPA to employ a POTW comparison test. Contrary to the suggestions, we find nothing on the face of the statute or in the legislative history to suggest that Congress intended for EPA to use a specific POTW benchmark.[19] Although Congress specifically directed the use of this comparison test, it did not issue any instructions as to how EPA was to structure or administer the test.

EPA considered a number of ways in which a POTW test could be formulated. 43 Fed.Reg. 37,572 (1978). One of the suggestions was that the POTW benchmark be based on the average pollutant removal costs for secondary treatment at POTWs, i. e., the increment from no treatment to secondary treatment. 43 Fed.Reg. 37,572 (1978). In addition to looking at average POTW costs for secondary treatment, EPA considered various incremental approaches below secondary treatment.[20] EPA reject-

16. Secondary treatment is the level of treatment that POTWs were required to have achieved by July 1, 1977 unless granted an extension. 33 U.S.C. § 1311(b)(1)(B). Secondary treatment has been broken down by the Administrator into three categories: biochemical oxygen demand (BOD), suspended solids (TSS), and pH. The parameters within each category are set forth in the Administrator's regulations. 40 C.F.R. § 133.102.

17. By 1983, POTWs are required to meet best practicable waste treatment technology over the life of the works, 33 U.S.C. § 1311(b)(2)(B), but such level of technology has not been specifically defined.

18. AST is not a technology-based limitation that is currently applicable to POTWs. Instead, AST was a term developed by EPA for a construction grant program for POTWs. AST is used to refer to a treatment facility that "can produce effluent of a higher quality than secondary, still using primarily secondary treatment technology." 44 Fed.Reg. 29,534 (1979). AST facilities must meet effluent limits from 10 to 29 milligrams per liter (mg/l) for BOD and TSS. *Id.* AST has been set at a level of 10

mg/l each for BOD and TSS for the POTW comparison at issue here. 44 Fed.Reg. 50,734 (1979).

19. We are not persuaded by the petitioners' citations to the legislative history. There is no reference to a specific POTW benchmark in either the Conference Report or in the House and Senate Reports. The references to the floor debates and to the other parts of the legislative history to which the petitioners direct our attention contain only minimal remarks concerning a POTW comparison from which we find it impossible to conclude that Congress intended EPA to use a specific POTW test. *See, e. g.*, 123 Cong.Rec. S19,637; 19,648 (daily ed. Dec. 15, 1977) (remarks of Sen. Muskie).

20. The analysis of the various approaches may be found in a memorandum to the BCT work group dated February 22, 1979 entitled "BCT—The POTW Test" from Louis DuPuis from EPA's office of Analysis and Evaluation, App. at 3086–92. *See also* Booz-Allen and Hamilton, Inc., "An Analysis of Alternatives for Evaluating Existing Industrial Effluent Guidelines,"

ed these proposals primarily because it felt that a proper POTW benchmark should be one roughly paralleling that with which it is to be compared—the industrial increment from BPT to BAT. Whereas industry was required to be at a BPT level in 1977, POTWs were required to have met effluent limitations based upon secondary treatment by 1977. EPA believed that a relevant basis of comparison for POTWs would be at an incremental level beyond secondary treatment since BCT would be at a level at least equal to BPT and in many cases beyond BPT. EPA considered several such increments.[21] After a careful consideration of various alternatives, EPA adopted a test employing a comparison of the cost of upgrading POTWs from secondary treatment levels. The selection of this upgrade comparison does not do violence to the language of the statute, and we do not find it to be arbitrary or capricious.

2.

Not only do the petitioners object to an incremental POTW benchmark, but they also object specifically to the use of the increment from secondary to AST as being too costly. In essence, the petitioners contend that even if EPA were permitted to use an incremental POTW benchmark, it should have used a narrower increment, one that more closely straddles the marginal cost of secondary treatment.

We reject this contention. We cannot substitute our judgment for that of EPA and condemn EPA for not choosing what we may consider to be the best increment. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). While we are obligated to scrutinize the record, particularly in a complex technical case such as this one, "[w]e must look at the [agency's] decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Id.*

EPA initially proposed comparing the incremental costs of removal from industrial plants with the incremental costs of removal from POTWs of a similar flow. EPA based its proposal on separate and distinct technologies for small and large POTWs and arrived at POTW cost-effectiveness ratios at an increment progressing from normal secondary treatment at 30 mg/1 each of BOD and TSS to better secondary treatment defined as 12 mg/1 each of BOD and TSS. 43 Fed.Reg. 37,571–72 (1978).

Both the Corn Refiners Association, Inc. (hereinafter the Corn Refiners) and the Council on Wage & Price Stability (CWPS) made suggestions on the calculation of an incremental POTW cost standard. The Corn Refiners condemned the proposed incremental flow reduction from 30 mg/1 to 12 mg/1 as too unrealistic and objected that such a reduction was based on chemical addition technology which encompasses higher costs than some other methods because of its higher purchase, storage, and disposal costs. The Corn Refiners recommended using a POTW increment based on an improved sedimentation technology. Memorandum: "Comments on the Agency's Proposed 'BCT' Limitations," from Corn Refiners Association, Inc. to EPA (Dec. 7, 1978) at 33–40, App. at 498–505. The Corn Refiners also recommended using POTW incremental costs based on a microscreen filtration technology. *Id.* at 50–55, App. at 515–20.

Unlike the Corn Refiners, the CWPS did not object to the proposed increments as being too large or too unrealistic. The CWPS' recommendations were aimed at achieving the same level of cleanup that EPA had proposed at a lower overall cost. Instead of EPA using a flow basis of comparison, the CWPS recommended that EPA utilize a flow weighted average of marginal costs for POTWs "computed as the weighted average of the incremental cost per pound removed by POTWs of different size, where the weighting factor is the number of plants operating at a particular flow rate

22–41 and Appendix (June 29, 1979) (prepared for EPA as a "Technical Assistance to EPA in the Development of Best Conventional Pollu-

tant Control Technology Rules"). App. at 3024, 3047–85.

**21.** *Id.*

multiplied by that flow rate." Comments of the Council on Wage & Price Stability to EPA (Dec. 7, 1978) at 8, 21, App. at 447, 459. The CWPS also recommended that EPA use as its basis a different technology from that proposed. The CWPS suggested a technology based on increases in sedimentation area; yet, it is not clear as to the sources on which CWPS relies.[22]

As indicated by the above comments of the Corn Refiners and the CWPS, there may be any number of increments based on slightly different technology or slightly different sizes of a given technology that EPA could have used. It is clear from the record that EPA was not oblivious to these comments.[23] Instead of using POTW cost reasonableness figures based on specific separate and distinct technologies employed by small and large POTWs, as it had proposed initially, in its final rules, EPA used a single POTW cost reasonableness figure based on the average of all cost-effective technologies used by POTWs operating beyond secondary treatment, but employing basic secondary treatment technology.

We cannot conclude that EPA acted arbitrarily and capriciously in choosing AST as the increment beyond secondary treatment for the POTW benchmark. While EPA sought to use an increment that narrowly straddled secondary treatment, i. e., one that closely approximated marginal cost, and although it admitted its failure to find the narrowest increment that would have more closely approximated marginal cost,

there is no statutory mandate requiring EPA to use an increment that equals marginal cost.

EPA has rationally justified its use of the AST increment. AST is the "knee-of-the-curve" point, the maximum cost-effective level of control for POTWs. The increment from secondary treatment to AST for POTWs was also determined by EPA to be roughly analogous to the industrial increment from BPT to BAT. While comments received by EPA have suggested that there may have been a narrower increment that EPA could have used, the suggestions by the commentors imply that EPA would have had to limit itself to a specific POTW technology to arrive at a smaller increment.

We are unwilling to place a straitjacket on EPA to so limit its decision making process. We find that EPA made its decision on its POTW comparison after it fully considered various alternatives, and that its decision is rationally based. We thus conclude that EPA's choice of an increment for POTWs from secondary treatment to AST was neither arbitrary nor capricious.

**3.**

The petitioners also challenge the POTW benchmark on the grounds that the POTW cost data upon which it was based are inadequate, statistically unreliable, and internally inconsistent. Recently, we have been apprised that EPA confesses error in the data in the two documents on which it relied in formulating its POTW benchmark.[24] EPA has moved this court for a

**22.** The CWPS merely noted: "[i]t is our understanding that as an alternative to the construction of a facility with increased retention time, the effluent concentration of these pollutants can be reduced to 20 mg/1 and possibly even to 15 mg/1 by increasing the sedimentation area." Comments of the Council on Wage & Price Stability to EPA (Dec. 7, 1978) at 20, App. at 458.

**23.** In an interagency memorandum, EPA specifically noted some of the alternative proposals for computing a POTW comparison figure that commentors such as CWPS had suggested. Memorandum: "BCT: The POTW Test," from Louis DuPuis from EPA's office of Analysis and Evaluation to BCT Work Group (February 22, 1979). App. at 3087–88. Although these recommendations related only to the flow basis of

the comparison aspect of EPA's original proposal, EPA did have an outside consulting firm analyze and compare several of the alternatives to the flow basis. Booz-Allen and Hamilton, Inc., "An Analysis of Alternatives for Evaluating Existing Industrial Effluent Guidelines," 31, App. at 3056. In its final rules, EPA adopted a single figure cost test comparable to one that the CWPS had recommended. 43 Fed.Reg. 50,-733–35 (1979).

**24.** Dames and Moore, "Analysis of Operations and Maintenance Costs for Municipal Wastewater Treatment Systems," (Feb. 1980) (Report prepared for EPA); Dames & Moore, "Construction Costs for Municipal Wastewater Treatment Plants: 1973–1977" (Jan. 1978) (Report prepared for EPA).

voluntary remand, and the petitioners do not contest the propriety of a remand solely to allow EPA to correct its data errors. Under these circumstances, therefore, we find it proper to remand this aspect of the case to EPA, but only for the purpose of allowing it to correct its data errors and to revise its BCT figures accordingly.[25]

### III.  CONCLUSION

We find no merit to the petitioners' other challenges.  Accordingly, we vacate the regulations promulgated pursuant to section 304 of the Act.  We remand this action to the agency with instructions to devise a cost-effectiveness test in accordance with the guidelines of this opinion and to correct its data errors.

*AFFIRMED IN PART, REVERSED IN PART AND REMANDED.*

PHILLIPS, Circuit Judge, concurring and dissenting:

I concur in the court's opinion save for Part II. A. dealing with the "cost effectiveness test."  As to that I respectfully dissent.

The gist of the court's opinion on this point is that in 33 U.S.C. § 1314(b)(4)(B) Congress unambiguously required the Administrator to use a precise two-part test in formulating BCT regulations.  The critical language of this statutory provision is characterized in the majority opinion as "clear and straightforward" and "unambiguous" on the point so that we need not resort to legislative history in divining its meaning and in holding EPA "to a standard of at least literal compliance" with its "plain meaning."  I simply disagree with this

threshold assessment of the clarity of the statutory directive.

To my reading it is instead at least sufficiently ambiguous to drive us first to the relevant if concededly inconclusive legislative history properly identified by the court and from that source to the standard of judicial review which compels us to give great respect and deference to contemporaneous agency interpretations of uncertain language in statutes defining agency powers and duties.  *See Power Reactor Development Co. v. International Union of Electrical, Radio and Machine Workers*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961);  *Fawcus Machine Co. v. United States*, 282 U.S. 375, 378, 51 S.Ct. 144, 145, 75 L.Ed. 397 (1931).

Attempting, as does the court, to divine the provision's plain meaning by parsing the convoluted key sentence only reveals, I suggest, that it will not effectively parse.[26] It is true that the two critical clauses from which the two-pronged test requirement is found by the court are phrased in the conjunctive, implying that they express parallel thoughts.  But a look at their content reveals that they can only be made parallel in thought by importing into the first clause a phrase, "by means of an industry cost-effectiveness test," that is not literally or plainly there.  Without that imported language—actually a construct out of whole cloth by the petitioners that has the happy effect of resolving the issue in their favor— the first clause simply lays down reasonableness of the cost/benefit relationship as a general standard for formulating the BCT regulations rather than positing, as the second clause surely does, a specific test by which reasonableness is to be gauged.[27]

**25.** After it corrects its data errors, EPA may discover that the increment from secondary treatment to AST is not the best increment for its POTW benchmark.

**26.** The difficulty of divining plain meaning by a close grammatical analysis of the sentence begins with its having as its subject the word "Factors." These "factors," as "identified" by the regulations, 33 U.S.C. § 1314(b), are—following the sentence—to "include consideration of the reasonableness of the relationship between the costs of attaining a reduction ... and the ... benefits derived ... and the comparison of the cost and level of reduction ...

from the discharge from [POTWS] to the cost and level of reduction from ... industrial sources, *and shall take into account* the age of equipment ..., and such other *factors* as the Administrator deems appropriate." (Emphasis added.)  With all respect, this is simply not a sentence so plain in its meaning that it unmistakably mandates the quite precise two-test methodology urged by petitioners and accepted by the majority as that literally compelled by an unaided reading.

**27.** That a cost-benefit analysis of this general nature is mandated by the provision in issue is beyond doubt.  In *American Textile Manufac-*

This, of course, is the way EPA interpreted it; it seems obviously to have been Senator Muskie's understanding; and it is at least arguably that of Representative Roberts, based upon the extracts from the legislative history cited by the majority.

Indeed, were we compelled judicially to find plain meaning in the literal language one way or the other, the "plainer" meaning to me is that given it by the agency. The most internally consistent reading for me is this: EPA is directed in devising BCT regulations to take as its lodestar the imposition of no further requirements (beyond those imposed by BPT) than can be justified by demonstrating a reasonable relationship between the costs incurred and the benefits to be achieved through compliance, looking always to the end goal of total elimination of pollutant discharges by 1985. In testing reasonableness of the cost/benefit relationship, EPA must compare—because it affords a convenient and trustworthy cost/benefit relationship for comparison—the experience in effluent level reductions had by publicly owned treatment works, and must as well take into account such obvious factors as age of equipment, etc.

But of course we are not compelled to find a plain meaning, and as indicated, I do not believe it exists. As between alternative possible meanings, with legislative history inconclusive (though in my view favoring EPA's interpretation), I would defer to the agency's interpretation as a wholly reasonable, certainly not arbitrary or capricious, one. *See* 5 U.S.C. § 706(2)(A); *Unemployment Compensation Commission of Alaska v. Aragan*, 329 U.S. 143, 153–54, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946). On this basis I would remand solely for the purpose of correcting the confessed data errors in setting the POTW benchmark, and let the agency get on with a critical task entrusted to it in 1977 with an implicit mandate at that time to complete it within a ninety day period [28] now long since passed.

*turers Institute, Inc. v. Donovan*, —— U.S. ——, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981), the Supreme Court, in the course of holding that Section 6(b)(5) of the Occupational Safety and Health Act of 1970 did not require the Secretary of Labor in promulgating Cotton Dust Standards to engage in *any* cost-benefit analysis, cited 33 U.S.C. § 1314(b)(4)(B) as one among several examples of clear indications of congressional intent that an agency do "engage in cost-benefit analysis." *American Textile Manufactures Institute, Inc.*, —— U.S. at ——, 101 S.Ct. at 2489 & n.30.

The majority now finds in this contrasting reference support for its holding that § 1314(b)(4)(B) "specifically require[s]" the EPA in setting BCT regulations "to determine what it would cost an affected industry to remove a pound of pollutant past the BPT level [and to] compare the cost of such removal with the benefits derived from the removal . . .," at 961. With all respect, I find in the Supreme Court's general reference no such specific significance. The contrast was merely between a statute which was read to mandate *no* cost-benefit analysis (OSHA) and various others, including § 1314(b)(4)(B), which obviously do mandate cost-benefit analysis of some kind in formulating regulations.

28. As the majority opinion notes, at 958, the 1977 amendments required agency review, under the newly mandated BCT standards, of all outstanding BAT limitation guidelines, within 90 days after the Amendment's enactment. Pub.L.No. 95–217, § 73, 91 Stat. 1609 (1977). The assumption by Congress that the BCT regulations could be in place within this time frame further suggests to me that it intended no such complex, rigidly prescribed administrative undertaking as the petitioners' two-prong mandatory test would inevitably require. Not at all plain, for example, is the procedure by which the results of two separate tests could be effectively melded. Certainly this would be a matter of some complexity which, under the petitioner's view, would undoubtedly itself be subject to challenge for failure of faithful execution. I simply cannot believe that Congress intended to bind the agency to any such precise methodology, with all that implies for ease of technical challenge and consequent delay in effective implementation.